**THOMAS J. FERRITO**
 **Attorney At Law**
    **SBN 45133**
**101 Church Street, Suite 14**
**Los Gatos, California 95030-6928**
        **Telephone: (408) 354-6655**
        **Facsimile: (408) 354-6585**

Attorney for Defendant
     CLAY H. ROJAS

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ] | **NO. CR-10-00931 LHK** |
| | ] | |
| **Plaintiff,** | ] | **SENTENCING MEMORANDUM** |
| | ] | **AND MOTION FOR** |
| **vs.** | ] | **DEPARTURE ON BEHALF** |
| | ] | **DEFENDANT CLAY H. ROJAS** |
| | ] | |
| **CLAY H. ROJAS,** | ] | |
| | ] | |
| | ] | |
| **Defendant.** | ] | |

     In accordance with Local Rule 32-5(b), defendant CLAY H.

ROJAS, respectfully submits this sentencing memorandum and

motion for departure.


                    **INTRODUCTION**

     At trial the government asserted that Rojas provided

information to Bettencourt from time to time in exchange for

Bettencourt's forbearance in collecting the balance due on the

no interest loan he had provided to Rojas. (Trial T/X, page 255.)

The defense conceded that Rojas illegally accessed computers and gave Bettencourt information obtained from them, but asserted that he acted out of friendship, and not financial gain based upon the uncontroverted facts that the loan preceded the actions, there was no due date on payment of the loan and there was no saving of interest (financial gain) because interest was not being charged on the loan, and therefore no quid pro quo. (Trial T/X, pages 274 and 275, 768 and 769.)

In addition, it was uncontroverted that there was never any discussion between Rojas and Bettencourt, nor any request by one to the other relating the forbearance to the provision of information. (Trial T/X, pages 748 and 753-755.)

During trial, defendant CLAY H. ROJAS readily admitted on direct and cross-examination to accessing information from protected computers alleged in counts 7 through 12, but denied honest services fraud alleged in counts 1 through 6. (Trial T/X, page 732 and 742; 763.) Neither he nor his trial counsel considered Bettencourt's forbearance on the non-interest loan to be a "financial gain" or quid pro quo for information provided to Bettencourt as there was never any discussion or agreement about the loan or the forbearance by Bettencourt being exchanged for the provision of the information to him (Trial T/X, pages

753–755 and 758–759). Trial counsel also argued that CLAY ROJAS had not acted with fraudulent intent (Trial T/X, pages 806–808).

Nevertheless, CLAY ROJAS was convicted on all twelve counts charged.

**THE DISTRICT COURT HAS THE AUTHORITY AND RESPONSIBILITY**

**TO EXERCISE ITS JUDGMENT AND DISCRETION**

**IN DETERMINING THE APPROPRIATE SENTENCE[1]**

In United States v. Booker, 543 U. S. 220 (2005), Kimbrough v. United States, 128 S.Ct. 558 (2007) and Gall v. United States, 128 S.Ct. 586 (2007) the Supreme Court has made clear that district court judges now have the ability as well as the responsibility to exercise their independent judgment in arriving at a sentence that is "sufficient, but not greater than necessary" to achieve the goals outlined in 18 U.S.C. 3553 as applied to a particular offender and offense.

In Booker, 543 U. S. at 756, the Supreme Court held that the mandatory nature of the Sentencing Reform Act of 1984 violated the Sixth Amendment right to a jury trial. "To remedy the constitutional infirmity, the Court severed the mandatory portions of the Act, rendering its sentencing provisions, including the Sentencing Guidelines, effectively advisory." United States v. Ameline, 409 F.3d 1073, 1074 (9th. Circ.

(2005)(en banc). The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough, 128 S.Ct. at 564. While "district courts still 'must consult [the] Guidelines, and take them into account when sentencing'" United States v. Cantrell, 433 F.3d 1269, 1297 (9th. Cir. 2006)(quoting Booker, 125 S.Ct at 767), the district courts "may not presume the Guidelines range is reasonable", Gall, 128 S.Ct. at 596-97) (citing Rita v. United States, 127 S.Ct. 2456 (2007))). And, as the Court's subsequent decisions in Gall and Kimbrough demonstrate, Booker's consultation requirement is not intended to limit the sentencing discretion of the district court.

In Gall, the Supreme Court held that appellate courts cannot impose a requirement that "a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances" Gall, 128 S.Ct. at 591. The court likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence", id. At 595, and held that it is within the discretion of the district court to arrive at an appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range". Id at 591.

---

[1] From a sentencing memorandum by attorney Paul B. Meltzer.

The district court in <u>Gall</u> had rejected a Guidelines range of 30 to 37 months in favor of a sentence of probation. The Supreme Court acknowledged that "[I]f the Guidelines were still mandatory, and assuming the facts did not justify a Guidelines-base downward departure, this would provide a sufficient basis for setting aside Gall's, sentence because the Guidelines state that probation alone is not an appropriate sentence for comparable offenses." <u>Gall</u>, 128 S.Ct. 601-602. But, the Court went on to explain, "the Guidelines are not mandatory, and thus the 'range of choice dictated by the facts of the case' is significantly broadened." <u>Id</u>. at 602. The sentence of probation was upheld.

The Supreme Court in <u>Kimbrough</u> upheld the decision of the district court to depart downward in recognition of the sentencing disparity between crack cocaine and powder cocaine offenses under the Guidelines strictly applied. The Court held that it is permissible for sentencing courts to impose a sentence outside of the Guidelines even when the decision to do so is "based solely on policy considerations, including disagreement with the Guidelines." <u>United States v. Baird</u>, 580 F.Supp.2d 889, 890 (D. Neb. Jan 11, 2008) (citing <u>Kimbrough</u>, 128 S.Ct. at 570).

Despite the "continuing duty of district courts to consult the Guidelines," <u>Cantrell</u>, 433 F.3d at 1279, the Supreme Court

has emphasized that a district court "may not presume that the Guidelines range is reasonable." <u>Gall</u>, 128 at S.Ct. 597. "Rather, after accurately calculating the advisory range, so that it can derive whatever insight the guidelines have to offer, [a district court] must sentence based upon 18 U.S.C. 3553(a) without any thumb on the scale favoring a guidelines sentence." <u>United States v. Villanueva</u>, 207 U.S. Dist. LEXIS 94823 (E.D.Wis) at *1 (quoting United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007)).

**<u>CIRCUMSTANCES OF THE OFFENSES</u>**

CLAY ROJAS was 36 years old at the time of the offenses, and prior to this case had no criminal record.

He served as a police officer over a period of ten years in three police departments (Salinas, San Jose and Santa Clara), was highly regarded and was injured in the line of duty.

He served honorably as a United States Marine assaultman during two tours of combat duty in Iraq, risked his life for his adopted country, was awarded many honors and was honorably discharged.

So what happened to cause this honorable and promising young person to commit the offenses for which he was found guilty? PRIDE. Pride, the first of the seven deadly sins,

<u>resulted in the commission of the offenses of which defendant</u> <u>CLAY ROJAS was convicted. He did not commit the offense due to</u> <u>greed or criminal disposition.</u>

CLAY is the third of five children born to Hermes and Esperanza Rojas. The parents brought their young family to the United States from the Nicaragua in 1978 when CLAY was four years old. His family had to flee Nicaragua because of the civil war. His aunt and her family had fled prior to them and established a residence in San Francisco, California. His father was working for the Nicaraguan government at the time and his life was in danger because the Sandinistas were out to eliminate all government employees and sympathizers of the old Somoza regime.

When they arrived in the United States the family had no knowledge of the English language. They lived with two other families in a two bedroom duplex in the Mission District of San Francisco. There were a total of 26 people living there at one time. CLAY's grandmother raised him and his sisters during those first years in the United States while his parents worked and learned English.

His father became a CPA and started his own business, which he ran successfully for 20 years. His mother became a nurse and retired from the County of Santa Clara after working at Valley Medical Center and other satellite clinics.

Presently two of his sisters live in Lincoln, California and others live in San Jose, California. All are married with children.

No one in CLAY's immediate family has ever been arrested or has any type of criminal record. All of them graduated from high school, attended college and have started careers in different fields. CLAY graduated from Milpitas High School in 1992, then went to San Jose City College and eventually Evergreen College where he obtained 60 units with an emphasis in Criminal Justice.

When his parents became United States citizens, CLAY also gained his citizenship because he was under 18 years old. They grew up in the south Bay Area and the family is very closely bonded.

CLAY married Tonya Rojas in 2002 during his enlistment in the Marine Corps. He did four deployments in four years and was never home, therefore their relationship suffered.  They separated in 2006 and were officially divorced in 2008.

CLAY married his current wife, Michelle Hernandez, in January of 2010. They are a blended family with 5 girls between them. They each have two girls from previous relationships and share in common Saharah, 19 months old. Their other daughters are Tatiana (5), Nisha (8), Angelique (12) and Kayla (17).

Being responsible for the support of his dependents, CLAY attempted to supplement his regular police officer income by

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

starting a business selling police related equipment. However, as he set forth in his statement of acceptance of responsibility, he was in dire financial straights as his former wife had taken approximately $35,000.00 from him and he needed to borrow money for his business. He was too full of pride to admit his need and borrow money from his family, friends or colleagues. Instead he borrowed small amounts of money from time to time from Bettencourt, knowing that Bettencourt would not tell anyone known to CLAY about his need for money or the loan and also because CLAY considered Bettencourt somewhat of a friend even though he was a police officer and Bettencourt was a supporter of, and eventually, a member of the Hells Angeles. As stated in the PSR Justification, this was "a complete lapse in judgment".

### 18 U.S.C. 3553 FACTORS FOR CONSIDERATION BY THE COURT[2]

The factors to be considered "in determining the particular sentence to be imposed" are set forth in 18 U.S.C. 3553(a).

Some of those factors are:

1. The nature and circumstances of the offense and the history and characteristics of the defendant.

As set forth above, the circumstance of the offense was pride, not greed or a criminal nature. CLAY was too prideful to

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

borrow money he needed from family, friends or colleagues to support his dependents and keep his business from going under. Instead, he borrowed from Bettencourt.

CLAY's history and characteristics, set forth above, exist in stark contrast to this one terrible mistake. CLAY has spent his lifetime defending and serving his country and community as a decorated combat veteran and as a distinguished former police officer, risking his life as both. While his military service resulted in a failed marriage, he is now happily married, works and supports his dependents, and contributes to his community.

2.   To protect the public from further crimes of the defendant.

Given his exemplary life before and after the offenses, the reason for the commission of the offenses (pride), and the fact that CLAY has forever lost his career as a police officer, his pension and his reputation, it is clear that CLAY will never again commit another crime. His statement of acceptance of responsibility, set forth in full in the PSR, demonstrates this as well.

3.   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

---

[2]  The USPO did not identify any 18 U.S.C. 3553(a) factors in the draft PSR, and the defendant objected to this failure in his response to the draft PSR.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

Since losing his job as a police officer and his related pension and benefits, CLAY has worked temporarily at several menial jobs in order to support his dependents until he could find employment which not only pays well, but allows him to use the knowledge and experience he gained from his military and police training and experience.

CLAY is currently employed at Conversant, Inc. as a product and business development manager for the defense holdings of his employer. His primary duty is dealing with the military accounts for the United States and NATO. The company is planning to move forward with public safety applications this year and CLAY is an integral part of that effort as well. Conversant, Inc. CEO Jason Frankel has written to the court that: "He [CLAY] is diligent, compassionate, patriotic and intelligent."

CLAY is also currently completing a Bachelor of Arts degree in Counseling Psychology at William Jessup University through the GI Bill.

Clearly, incarceration would not due CLAY any good. Rather, it would result is his losing an opportunity for a career related to his lifetime of military and public safety service. He has always been a self-motivator, and probation would allow him to retain his new job, support his dependents and develop his new career.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

The U. S. Sentencing Commission passed several amendments to the Sentencing Guidelines that became effective on November 1, 2010.  Many of these changes allow for reduced sentences in keeping with the initial philosophy reflected above. Two such amendments relate to Chapter Five of the Guidelines, which is the basic framework for determining an appropriate sentence. The Commission expanded the availability of alternatives to incarceration.

Specifically, it expanded Zone B where probation is authorized, and extended Zone C, where at least half of the minimum term must be satisfied by imprisonment. The result is an expanded opportunity for Courts to assign sentences within Zones B or C, where probation or other alternatives to imprisonment are a possibility.

This direction of assessing sentencing factors opens access to more lenient sentences. The Commission appears to be sending a message for the Courts to look at alternatives to incarceration, in keeping with its initial philosophy to "…cut down on the incidents of unnecessary lengthy terms of incarceration."

The court is urged to consider this message and determine in this case that a sentence of probation would be "sufficient, but not greater than necessary" to achieve the goals outlined in 18 U.S.C. 3553 as applied to this defendant and his offenses.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

## DEFENDANT'S OBJECTIONS

## TO THE OFFENSE LEVEL CALCULATION IN THE PSR

While the defendant agrees that applicable base offense level is 14, the defendant objects to the adjusted offense level of 22 calculated by the USPO.

Rather, the defendant urges the court to find the adjusted offense level to be 12, but no greater than 14, depending on the determination of the applicability of the obstruction of justice, but <u>before</u> considering downward departures set forth below.

1. The USPO adds 2 points pursuant to 2C1.1(b)(1).

However, USSG 2C1.1. application note 2 reads:

> Subsection (b)(1) provides an adjustment for offenses involving more than one incident of either bribery or extortion. <u>Related payments that, in essence, constitute a single incident of bribery</u> or extortion (e.g., a number of installments for a single action) <u>are to be treated as a single bribe or extortion, even if charged in separate counts.</u>

The government's theory was that, based upon the alleged conspiracy, Rojas provided information to Bettencourt from time to time (installments) in exchange for Bettencourt's forbearance in collecting the balance due on the no interest loan he had provided to Rojas. (Trail T/X, page 255.) While the information, "payments" as defined in application note 1, were provided on

several occasions (related installments), the "bribe" was a continuing act of ongoing forbearance.

The reliance by the UPSO on the fact Rojas received multiple loans from Bettencourt is misplaced. CLAY testified in trial and stated in his interview with his colleagues at the Santa Clara Police Department that at the time of the alleged conspiracy, and during the time he accessed the protected computers, he owed Bettencourt approximately $1,400.00 and that this was the amount due when arrested. (Trial T/X, pages 747.) The multiple requests for information were payments related to the continuous act of forbearance.

2. The USPO adds four points pursuant to USSG 2C1.1(b)(3).

In <u>United States v. Stephenson</u>, 898 F.2d 867 (2nd. Cir. 1990), it was held that the USSG 2C1.1 (b) (3) enhancement applies to officials sitting in "high positions of public trust", not mid-level government employees.

Rojas was a "street cop" with no *high* position of public trust.

3. The USPO adds 2 points pursuant to USSG 3C1.1.

Adding two points to the offense level based upon obstruction of justice would increase CLAY's sentence by a significant number of months. Contrast this with the sentence of probation recently recommended by the USPO and imposed by a judge of this district upon Barry Bonds, who was convicted of

intentionally giving false testimony to the grand jury. U. S. v. Bonds, CR-07-0732. Bonds, a professional baseball player, has wealth and fame, and did good works. CLAY is a decorated Marine combat (assaultman) veteran, who risked his life serving in combat in Iraq, was a former highly regarded police officer for ten years injured in the line of duty, and also has done good works. CLAY has accepted responsibility and expressed remorse for his actions, whereas Bonds has not accepted responsibility and is appealing his conviction.

Application note 2 to USSG 3C1.1 provides that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice".

CLAY was under oath during his trial testimony, but not under oath when interviewed by his colleagues in the Santa Clara Police Department. While neither his trial testimony nor his interview were entirely internally consistent, the government chooses to rely on the latter so as to boost the offense level.

The government's theory in trial was that Rojas provided information to Bettencourt from time to time in exchange for Bettencourt's forbearance in collecting the balance due on the no interest loan he had provided to Rojas. (Trial T/X, page 255.)

The defense conceded that Rojas illegally accessed computers and gave Bettencourt information obtained from them,

but asserted that he acted out of friendship and not financial gain based upon the uncontroverted facts that the loan preceded the actions, there was no due date on payment of the loan and there was no saving of interest (financial gain) because interest was not being charged on the loan, and therefore no pro quo. (Trial T/X, page 274 and 275, 768 and 769.)

In addition, it was uncontroverted that there was never any discussion between Rojas and Bettencourt, nor any request by one to the other relating the forbearance to the provision of information. (Trial T/X, page 748 and 753-755.)

Statements during in his interview that he felt "internal pressure" to provide the information to Bettencourt were, as described in Rojas' acceptance of responsibility, based upon his desperate desire to avoid being perceived as a traitor to his colleagues and the department.

In his interview Rojas admitted, as he did in trial, that Bettencourt lent him money and that he had accessed protected computers and provided information he obtained to Bettencourt. However, he denied, as he did in trial, that there was a quid pro quo because there was never any agreement, or even discussion, relating the loan or the forbearance by Bettencourt to the provision of information.

His law enforcement career was over, his pension was gone, had no income with which to support his family, and he would

16

never again be able to work in law enforcement. His main concern during the interview was that his colleagues not perceive him as having been disloyal to them or to the department, because he had not been disloyal and had not betrayed them. Therefore, when they asked him about whether he felt pressure to provide the information to Bettencourt when asked, he agreed that he felt pressure, but that it was "internal", not external from Bettencourt, and that he did it out of friendship. His trial testimony was essentially the same. (Trial T/X, page 732, 742, 745, 747-750, 755-762, 765, 793, 795.)

   4.   Whether or not the court decides to accept the recommendation of the USPO to add 2 points pursuant to USSG 3C1.1, CLAY is entitled to a 2 point reduction pursuant to USSG 3E1.1 for his acceptance of responsibility and genuine contrition.

   Application note 2 provides that conviction by trial does not automatically preclude a defendant from consideration of the reduction for acceptance of responsibility, and application note 4 provides that adjustments under both USSG 3C1.1 and 3E1.1 may apply. This is one such instance.

   In trial Rojas readily admitted on direct and cross-examination accessing information from protected computers alleged in counts 7 through 12, but denied honest services fraud as alleged in counts 1 through 6. (Trial T/X, page 732 and 742;

763.) Neither he nor his trial counsel considered Bettencourt's forbearance on the non-interest loan to be a "financial gain", and at the time of the first instance there was no outstanding loan. (Trial T/X, page 745).

He also testified that he gave another friend, Villalobos, information from a protected computer for no financial gain. (Trial T/X, page 748-749.)

In addition, application note 1(F) provides that voluntary resignation from the office or position held during he commission of the offense can be used to determine whether a defendant qualifies under sub-section (a). Rojas voluntarily resigned from his employment as a police offer for the City of Santa Clara. (Trial T/X, page 732.)

Morevoer, in United States v. Garrido, 596 F.3d 613, 2010 U.S. App. LEXIS 3923 (9th Cir., February 25, 2010, Filed), the court held that even if the defendant did not accept responsibility for a 18 U.S.C.S. § 924(c) charge, that did not automatically disqualify him for a reduction on a robbery charge, and the district court had the legal authority to consider his eligibility for a reduction of sentence for acceptance of responsibility for the robbery.

The court, cited U. S. v. McKinney, 15 F.3 849, at 853, which held that:

            Although the application notes list only

> this single example of a case where a
> defendant can receive the reduction despite
> going to trial, the quoted passage itself
> makes clear that the example was not
> intended to be exhaustive. *Id*.
> [I]n appropriate circumstances <u>the reduction
> is . . . available in cases in which the
> defendant manifests genuine contrition for
> his acts but nonetheless contests his
> factual guilt at trial</u>. (Emphasis added.)

The McKinney court went on to say:

> Our focus on the defendant's personal
> contrition, rather than on his exercise
> of his constitutional rights, best serves
> the purposes of the acceptance of
> responsibility reduction. <u>The primary goal
> of the reduction is to reward defendants
> who are genuinely contrite.</u>
> *See* <u>U.S.S.G. § 3E1.1</u> commentary and background;
> *United States v. Wivell, 893 F.2d 156, 158 (8th
> Cir. 1990)*. In the ordinary case, a defendant
> who pleads not guilty and is convicted will have
> a difficult time convincing the court that his
> subsequent acceptance of responsibility for his
> actions is anything but a self-serving and
> insincere expression. <u>Where the defendant's
> statements and conduct make it clear that his
> contrition is sincere, however, he is entitled
> to the reduction even if he is convicted after a
> trial</u>. (Emphasis added.)

Therefore, it is suggested that the adjusted offense level

should be 12, but no greater than 14, <u>before</u> considering

departures and 18 USC 3553 issues factors.


**APPLICABLE DEPARTURES NOT CONSIDERED IN THE PRE-SENTENCE REPORT**

The USPO failed to consider applicable downward departures

set forth below.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

Reaffirming the judicial independence to grant departures, in Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035 (1996), a case like that of CLAY ROJAS wherein the defendants were police officers, the Supreme Court explained that there is room under the guidelines for federal judges to exercise traditional sentencing discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue". *Id.* at 2953.

1. USSG 5H1.5– Employment Record.

While, a defendant's "employment record is not ordinarily relevant in determining whether a departure is warranted", departures based on discouraged factors should occur only "in exceptional cases". United States v. Koon*, 518 U.S. at 95, 116 S.Ct. 2035.). *(Emphasis added.)

Although CLAY's police and military employment history is exceptional and should not be precluded from consideration, in the Justification section of the PSR the USPO concludes that it should not be considered because "violated an employer's trust" and while his "military service is commendable, it does not mitigate the seriousness of the offense".

CLAY has been employed throughout most of his life. Starting in high school he worked in a pizza maker. Through the majority of his adult life he has worked in providing services

to protect and defend the freedoms of this country and it's communities. He has routinely placed his life on the line to afford his fellow citizens the protection and freedoms we enjoy daily.

The 2nd, 5th and 8th Circuits have allowed for departures based on a defendant's employment history: In U.S. v. Jagmohan, 909 F.2d 61 (2d Cir. 1990) the defendant had been gainfully employed for nine years since entering the country and he used a personal check in the bribery transaction, which reflected an utter lack of sophistication; in U.S. v. Harris, 293 F. 3d 863 (5th Cir. 2002) the district court could properly consider a police chief's "unblemished record" as a police officer in departing downward in a civil rights case; and in U.S. v. Big Crow, 898 F.2d 1326 (8th Cir. 1990) defendants "excellent employment record" and his constant efforts to overcome the adverse environment of the Pine Ridge Reservation were proper basis for departure because they were of a magnitude not adequately taken into consideration by the guidelines.

2. USSG 5H1.11 – Military, Civic, Charitable, or Public Service: Employment-Related Contributions; Record of Prior Good Works

> Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

> Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.

The Commission has determined that applying this departure standard of considering military service is appropriate because such service has been recognized as a traditional mitigating factor at sentencing. See, e.g., <u>Porter v. McCollum</u>, 130 S.Ct. 447,445 (2009) in which it was stated that "[O]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines…"."

CLAY has served honorably as a United States Marine with two combat missions in Iraq and foreign assignments in Haiti and the Philippines. He was recognized in 2004 for his service by the United States Ambassador to Haiti for his "…dedication, professionalism and courage serving as a member of FAST (Fleet Antiterrorism Security Team)." CLAY's Marine Squad was in Haiti due to the unrest in the country because of Haiti's lack of leadership at the time. While a squad leader in Iraq, CLAY's unit came under enemy fire on numerous occasions. While in Haqlania, Iraq on February 22, 2005, he and his squad came under enemy fire and CLAY "…left a position of cover that exposed him to enemy fire as he ran to the breach point and place the explosive." He was able to set the explosive off and he, with

22

his squad, accomplished their mission with no causalities. For this act, the Marine Corp awarded CLAY with the Navy and Marine Corps Achievement Medal with Combat Distinguishing Device.

Although civic, charitable, public service, employment-related contributions and similar prior good works are not ordinarily relevant in determining whether a departure is warranted, they are not prohibited.

The 3rd and 10th Circuits have allowed for departures under this section for defendant's long history of community service and good works. U.S. v. Serafini, 233 F.3d 758 (3rd Cir. 2000) affirming downward departure where defendant, a state legislator, had engaged in acts of personal kindness and good works that were above and beyond customary political and charitable giving; U.S. v. Jones, 158 F3d 492 (10th Cir. 1998) affirming departure based in part on defendant's long history of community service and his strong support in the community.

CLAY has been contributing selflessly in his church, the community and his country for the majority of his life in exceptional ways. His community service and good works are intertwined with his religious affiliations. He spends most of his free time involved with his church activities when not with his young family. His time and efforts are not for financial gain but for the good of the community. This young man surrounds himself in doing good things within his community.

This has been attested to in the many letters received by the Court and those who have been interviewed.

In addition, CLAY was injured in the line of duty as a police officer. As a result he underwent constructive surgery on his ankle, remains in pain, has limited motion and must have surgery to remove the pins which were inserted during the first surgery.

2. USSG 5K2.20–Aberrant Behavior.

Subsection (b) provides that:

> The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by he defendant from an otherwise law-abiding life.

Although CLAY was convicted of accessing protected computers on several occasions, according to the government's own theory, he did so, as described above, as a result of a single conspiracy (transaction) with Bettencourt for Bettencourt's single continuous act of forbearance. (Application Not 2 would not seem to apply to this particular situation.)

Even though the access took place over a period of time, no planning was required and the actual time of access was limited to the mere minutes if not seconds it would take to obtain the information. Finally, as described herein, CLAY's life to the

time of what the USPO described as "a serious lapse in judgment" has been exemplary.

Application Note 3 sets forth other circumstances for the court to consider. It provides that:

> In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (b) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the offense.

Items B through D have been set forth herein and will not be repeated again here.

3. USSG 5K2.19-Rehabilitation.

On January 19, 2012, the United States Sentencing Commission issued "Proposed Amendments to the Sentencing Guidelines", one of which is *Rehabilitation*, at USSG 5K2.19.

The Commission proposes to amend this section to provide rehabilitative efforts, <u>whether pre or post sentencing</u>, which may be relevant in determining whether a departure is warranted, if the efforts, individually or in combination with other circumstances, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. It also adds commentary to §5K2.19 that sets forth a two-part test for determining whether a departure may be warranted and factors

for the court to consider in determining whether a departure may

be warranted.

    The proposed Amendment reads as follows:

    Proposed §5K2.19 – Rehabilitation

        Rehabilitative efforts may be relevant
        in determining whether a departure is
        warranted if the rehabilitative efforts,
        individually or in combination with other
        circumstances are present to an unusual
        degree and distinguish the case from the
        typical cases covered by the guidelines.
        In addition, pre-sentencing rehabilitative
        efforts may be relevant in determining
        acceptance of responsibility under §3E1.1
        (Acceptance of Responsibility), and post
        sentencing rehabilitative efforts may provide
        a basis for early termination of supervised
        release under 18 U.S.C. § 3583(e)(1).
        (Emphasis added.)

    Proposed Application Note (the portion that pertains to

CLAY's case):

        1.   In determining whether to provide a
        downward departure based on
        rehabilitative efforts, the court should
        consider whether the defendant engaged in
        a pattern of activity that demonstrates
        that (A) the defendant has been making a
        genuine and purposeful effort to lead a
        law-abiding life and (B) the effort is
        likely to be successful. The pattern of
        activity should involve specific
        rehabilitative acts. Examples of such
        acts are voluntarily withdrawing from a
        conspiracy, obtaining counseling,
        entering drug treatment, maintaining
        regular employment, making efforts to
        remedy the harm caused by the offense,
        and making educational progress. The

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

court may also consider the extent to
which the specific rehabilitative acts
were taken at the defendant's own
initiative.

CLAY continues to lead a law abiding lifestyle as he has

his entire life except for the incident that places him before

the Court for sentencing. He is a well respected member of his

community, church, employment team and family.

As set forth herein, since being terminated as a police

officer, CLAY has maintained regular employment or been actively

looking for work. He has done odd jobs, house painting and even

window washing to keep his family fed, his bills paid and

maintain some normalcy for his family.

Currently he is employed with a firm that provides him an

excellent opportunity for advancement, depends on his expertise

to obtain military defense and public safety contracts and will

suffer immensely if he is not available.

Additionally, CLAY is making significant educational

progress and will graduate with a Bachelor of Arts degree in

2013 if allowed to continue uninterrupted.

It appears that the Sentencing Commission continues to

refine the Guidelines in order to allow for leniency when needed

and by recognizing the Rule of Lenity.

The court is urged to sentence CLAY accordingly.

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS

**<u>DEFENDANT'S SENTENCING REQUEST</u>**

Defendant CLAY H. ROJAS urges the court to find the adjusted offense level to be 12, but no greater than 14, depending on the determination of the applicability of the obstruction of justice, and after considering the downward departures requested above, and the 18 U.S.C. 3553 factors set forth above, exercise it's discretion by imposing a sentence of probation.

Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 USC Section 3353(a).

Dated: February 21, 2012.


Respectfully submitted,


_/s/_____
THOMAS J. FERRITO
Attorney for Defendant
CLAY H. ROJAS

SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE
ON BEHALF OF DEFENDANT CLAY H. ROJAS