MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

DANIEL R. KALEBA  (CABN 223789)
JEFFREY B. SCHENK(CABN 234355)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, CA 95113
   Telephone: (408) 535-5061
   Fax:  (408) 535-5066
   E-Mail: daniel.kaleba@usdoj.gov
           jeffrey.b.schenk@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No.  CR 10-00931 LHK |
| Plaintiff, | ) | |
| | ) | **UNITED STATES' SENTENCING** |
| v. | ) | **MEMORANDUM** |
| | ) | |
| CLAY H. ROJAS, | ) | Date:      February 29, 2012 |
| | ) | Time:      9:00 a.m. |
| Defendant. | ) | Court:     Hon. Lucy H. Koh |
| | ) | |

The United States respectfully recommends the Court sentence defendant Clay Rojas to a sentence of imprisonment of 41 months.  Defendant sold access to law enforcement databases in exchange for bribes in the form of forbearance on a debt.  He injured the public by placing his personal interests ahead of the public he served.  He undermined the public's confidence in law enforcement, and damaged the reputation of the Santa Clara Police Department.  While taking the witness stand in his own defense, defendant provided false testimony in an attempt to mislead the jury.  The offense conduct proved his lack of respect for the law.  His trial conduct reinforced this deficiency.  A meaningful custodial sentence should therefore be imposed by this Court.

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK

## I. THE GUIDELINES CALCULATION

The government agrees with the United States Probation Office's Guidelines calculation, and acknowledges the thoroughness of the Presentence Report. The base offense level for the honest services fraud counts, specifically, Counts One through Six, is 14 because the defendant was a public official at the time of the offense conduct. U.S.S.G. § 2C1.1(a)(1). For the reasons stated below, the government agrees with the sentencing enhancements for the multiple bribes, public official in a sensitive position, and obstruction of justice.

The government agrees with the Probation Office that no credit for acceptance of responsibility is justified. Defendant does not accept full responsibility for his illegal conduct. Defendant employed the trial strategy of admitting illegal computer access not for financial gain (the misdemeanor charges of Counts Seven through Twelve) in hopes of avoiding conviction on the felony counts, which were dependent on the finding of a *quid pro quo*, or private financial gain to defendant. The jury disagreed. The inescapable conclusion of its verdict found the existence of the *quid pro quo*, and that defendant committed the charged acts for financial gain. A defendant cannot pick and choose the portions of an indictment for which he will accept responsibility, and later request credit for that acceptance based upon only a partial acceptance of responsibility. Specifically, Application Note 1 to U.S.S.G. § 3E1.1 requires a defendant to "truthfully admit[] the conduct comprising the offense(s) of conviction" in order to qualify for credit for acceptance of responsibility. Here, defendant accepted only a limited scope of responsibility, and put the government to its burden of proving the remainder of the Indictment. That is insufficient to qualify for credit under § 3E1.1.

### A. The Offense Involved More than One Bribe.

The government proved during trial that defendant provided confidential information to William "Billy" Bettencourt on multiple occasions in exchange for forbearance on the debt that defendant owed Bettencourt. The relevant Guidelines provide a two-level enhancement if the offense involved more than one bribe. U.S.S.G. § 2C1.1(b)(1). According to the Guidelines commentary, "[r]elated payments that, in essence, constitute a single incident of bribery or

extortion ( e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." U.S.S.G. § 2C1.1, comment. n. 2. The facts of this case prove that the nature of this conspiracy involved multiple requests for information from the defendant in exchange for additional time to repay the debt owed to Bettencourt. For example, unauthorized queries were done for Bettencourt on July 9, 2010 (Counts Eight and Nine); August 20, 2010 (Count Ten); and September 3, 2010 (Counts Eleven and Twelve). The only time Bettencourt asked for information is when defendant owed Bettencourt money, and in exchange for the information, Bettencourt gave defendant an extension to repay the debt. *See* Exhibit 46.11. For example, defendant stated:

> Rojas: And he didn't ask me for anything like to run his name or do anything like that. Um, you know, the only times he's done it was when; there hasn't been too many times where I'm outstanding on a loan, so the times that I am he's taken advantage of that.
>
> Gilbert: And does he make the connection between, "You run the plate and you owe me money" or make some kind of?
>
> Rojas: Kind of. He just gives me an extension. He won't ask.
>
> . . . .
>
> Gilbert: Is there a timeline that he's put you on when you borrow money?
>
> Rojas: Sometimes. Like he'll say…
>
> Gilbert: Tell me about that.
>
> Rojas: He'll say, "Can you pay me next payday?" And if we go past that, then he'll just send a reminder notice or he'll ask for a favor like "run my name."
>
> Exhibit 46.11

Furthermore, defendant acknowledged that the exchange of information for time was Bettencourt's way of charging interest, and the requests occurred on multiple occasions. He states:

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                    3

1  Cooke: So we have it happening in August. We have it happening in September.
2  And that's all I just brought with me to talk to you now… You're telling us it
3  happened in '09, so this has been going on pretty regularly probably since '09.
4  When you're on the hook, and you're under pressure. You're late on your
5  payments. This is his way of charging interest, Clay. That's what's happening here,
6  right?
7  Rojas: Yeah, you could say that.
8  Exhibit 46.14

10  Finally, this arrangement between Bettencourt and defendant should not be characterized
11  as installment payments on a single bribe in exchange for a single action. According to the
12  defendant, the debt fluctuated over time like a line of credit, borrowed in different amounts and
13  repaid at different intervals. *See*, Exhibit 46.1 (Rojas.: "He loaned me a total of maybe five
14  grand which was over a period of time. . . Gilbert: And it was $5,000? Rojas: Yeah, , I think a
15  total maybe of 5. Gilbert: Like in one chunk or? Rojas: No, in just little bits. You know, a
16  thousand here, you know, a couple hundred there, just to get by.")   The official actions done by
17  defendant, while part of a common scheme, were themselves unique, separate acts. Further
18  demonstrating the uniqueness of the official actions, the information provided by defendant to
19  Bettencourt had a timeliness issue: Bettencourt's warrant status became stale the minute the
20  query was completed. No fixed final sum ever appears to have been determined between
21  Bettencourt and defendant for either the loan amount or the number of database queries. Indeed,
22  from Bettencourt's perspective, it was important to keep the line of credit open because it was the
23  existence of the debt itself that bought him access to confidential information. *See* Exhibit 46.11
24  (Rojas: "The first time he asked me to run it was…you know. He never asked me to do stuff like
25  that or run his name unless I owed him money and um, so yeah, last year, I'm still trying to pay
26  off this debt to him. Gilbert: Uh-huh… Rojas: And me, you know, my conscience, I'm like, I
27  know why he's doing it, you know? He wouldn't ask me if I didn't owe him." *See also* Reporter's

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                 4

Transcript ("RT") 741:7-16 (defendant testifying that he borrowed money from Bettencourt approximately ten times, and the largest amount borrowed was between $2,000 and $2,500)). The underlying facts demonstrate the multiple and unique characteristics of the *quid pro quo* in the course of this conspiracy, and thus the multiple bribe enhancement applies.

The Ninth Circuit has applied this enhancement where multiple payments are made over time for different official actions. For example, in *United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994), the court found that three separate payments to promote "different applications for work papers" constituted more than one bribe. In *United States v. Morales*, 11 F.3d 915, 916 (9th Cir. 1993), the court held that because "the bribes came from various sources," and because "the numerous payments in 1989 and 1990 [were] in different amounts and at different intervals," they "were separate acts of bribery."

The case law developed in the Second Circuit identifies three factors to be considered in determining whether multiple payments constitute a single bribe. These factors are: "(1) whether 'the payments were made to influence a single action,' (2) whether 'the pattern and amount of payments bear the hallmarks of installment payments' because they constitute partial payments of 'a fixed final sum,' and (3) whether 'the method for making each payment remains the same.'" *United States v. Soumano*, 318 F.3d 135, 137 (2d Cir. 2003) (quoting *United States v. Arshad*, 239 F.3d 276, 280-82 (2d Cir. 2001)) (internal citations omitted).

Under the Second Circuit approach, the multiple bribe quality of the *quid pro quo* scheme is readily apparent. The loan was ongoing, and thus "made to influence" more than a "single action." The jury found that defendant engaged in multiple official actions at the request of Bettencourt as part of this scheme (*See, e.g.,* Counts Two, Five, Six, and Eight – Twelve). Defendant borrowed money "a thousand here" and "a couple hundred there" (Exhibit 46.1) – not in the form of partial payments on a fixed final sum, like an installment payment. A factual basis in support of this enhancement exists, and the base offense level should accordingly be increased two levels.

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                              5

**B.     The Offense Involved a Public Official in a Sensitive Position.**

Defendant was a law enforcement officer during the offense conduct.  The Guidelines provide a four-level enhancement if the offense involved a public official in a sensitive position.  U.S.S.G. § 2C1.1(b)(3).  Application Note 4(B) to this provision states: "Examples of a public official who holds a sensitive position include . . . a law enforcement officer."  According to the plain language of the Guidelines and its commentary, defendant by definition occupied a sensitive position, and the four-level enhancement should be added to the base offense level.

The trial evidence also proved that defendant occupied a "sensitive position."  As an officer with the Santa Clara Police Department, the defendant was entrusted with the power to make arrests, to conduct criminal investigations, and to access confidential databases, such as criminal history and DMV records.  Access to such databases was permitted on a "need to know, right to know" basis only.  *See, e.g.*, Trial Testimony of Gina McWilliam, at 375:20 – 376:24; Trial Exhibit 5.  Defendant sold his access to these databases to Bettencourt, providing information on Bettencourt's arrest warrant status (Count Two), as well as personally identifiable information about two persons identified in the Superseding Indictment as S.W. (Count Five) and C.C (Count Six).  The conduct falls within the Guidelines definition of occupying a sensitive position.

Application of this enhancement to a law enforcement officer has been recently approved by the United States Court of Appeal for the District of Columbia.  In *United States v. Johnson*, 605 F.3d 82 (D.C. Cir. 2010), the court considered § 2C1.1(b)(3) and held: "[I]t seems plain to us that there is nothing inconsistent about using a law enforcement officer as an example of a public official in a 'sensitive position.' Whatever the precise scope of that term, whatever other positions might fall within its ambit, it certainly includes law enforcement officers, like Johnson, who are charged with the power to make arrests-a sensitive power if there ever was one." *Johnson*, 605 F.3d at 83.  Here, defendant was placed in a position of power to make decisions on behalf of the government, and, relevant to the charged conduct, had access to confidential information by virtue of his position as a police officer.

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                                6

The defense's reliance of the Second Circuit case *United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990) is misplaced. In that case, the court declined an upward departure based on an employee's "sensitive" position within the Commerce Department. The court held that even if the defendant, as an export licensing officer, had "some degree of discretion" and had a security clearance, that "does not set him apart from a multitude of personnel in the federal service." *Stephenson*, 895 F.2d at 878. Unlike here, where the Application Note specifically includes law enforcement officers as public officials in a sensitive position, in *Stephenson* the court interpreted the general catch-all phrase "other government officials with similar levels of responsibility." *Id.* at 877-78. The court noted that the Commentary to Guideline § 2C1.1(b)(2) underscored the Sentencing Commission's intent that the provision apply to corruption by officials sitting in high positions of public trust, and not employees such as the export licensing officer.

### C. The Defendant Obstructed Justice through His False Trial Testimony.

The Guidelines provide a two-level enhancement if a defendant willfully obstructs, or attempts to obstruct, the administration of justice with respect to the prosecution of the instant offense of conviction, and if the obstructive conduct related to the defendant's offense of conviction and any relevant conduct. U.S.S.G. § 3C1.1. The two-level enhancement applies here. Defendant adopted the legal strategy at trial to admit to the misdemeanor conduct of the unauthorized database queries from Counts Seven through Twelve, but deny the *quid pro quo* between Bettencourt and himself, or that he ever received any financial benefit from Bettencourt in exchange for the information. If successful, defendant would avoid conviction of the felony counts. In furtherance of this strategy, defendant had to provide some explanation to the trial jury for his prior statements admitting the financial benefit he received, and the *quid pro quo* of the conspiracy. In contradiction to his post-arrest statements, at trial defendant denied, among other things: (1) that he provided information in exchange for more time to repay the debt; (2) that Bettencourt only asked him to run queries when money was owed; and (3) that demanding information was Bettencourt's way of charging interest. His trial testimony on this subject was not the product of confusion, mistake, or faulty memory. Rather, it reflected a willful attempt to

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                    7

avoid conviction on the honest services fraud and felonious unauthorized database query charges. He intentionally interfered with the finder of fact on a key element of the government's case by attempting to mislead them on the existence of the *quid pro quo*. The jury rejected the defendant's trial testimony, and returned convictions on all counts.

The Ninth Circuit recently reiterated the requirements for an obstruction of justice enhancement: "Before it may adjust defendant's sentence for obstruction of justice, the district court must find that: 1) defendant gave false testimony; 2) the testimony was on a material matter; and 3) defendant had 'willful intent' to provide false testimony." *United States v. Jimenez-Ortega*, 472 F.3d 1102, 1103 (9th Cir. 2007) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). In *Dunnigan*, the Supreme Court explicitly recognized that perjury can satisfy the obstruction of justice enhancement: "The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95. As the Ninth Circuit explained in *United States v. Arias-Villanueva*, this means that a witness testifying under oath must be found to give material false testimony with willful intent to provide false testimony, rather than as result of confusion, mistake, or faulty memory. *Arias-Villanueva*, 998 F.2d 1491, 1512 (9th Cir. 1993); *see also United States v. Gaudin*, 515 U.S. 506, 522-23 (1995) (sentencing judge must make a finding of materiality). To sustain a finding that defendant obstructed justice within the meaning of the Sentencing Guidelines, it is not necessary, however, that defendant's false statements actually mislead or impede the machinery of justice. It must only have potential for doing so. *United States v. Baker*, 894 F.2d 1083, 1084 (9th Cir. 1990) ("[S]ection 3C1.1 on its face encompasses 'attempted' obstruction of justice as well as actual obstruction.").

The following statements from defendant's trial testimony were false and material:

1. **On the Existence of a Debt Owed.**

   a. **Direct Testimony**

   Q. Did you owe him any money?

   A. No.

   Q. Was there any financial exchange as a result of you running his record check for him?

   A. No.

   Q. So why did you do it?

   A. I just did it as a favor to a friend.

   RT 731:21 – 732:2

   b. **Post-Arrest Statement**

   Gilbert: Has he ever asked about anybody else, like, hey can you check on names for me; run plates. Do any of that kind of stuff?

   Rojas: Um. Yeah, I think he's asked about plates and stuff like that.

   Gilbert: Tell me about that.

   Rojas: He just said, hey, you know, "Can you run this plate for me? I want to see who it comes back to?" Usually when he'd do that, I'd try to like say, "OK, yeah, I'll get back to you," or something like that, and then I remember doing it a couple of times. And those I don't really remember because that was a long time ago. <u>That was sometime last year and uh, this is still you know after owing him money and then just basically telling him who the plate came back to and stuff like that</u>.

   Exhibit 46.10

2. **Defendant Admits to Unauthorized Queries but Denies Financial Benefit.**

   a. **Direct Examination**

   RT 732:3–16 – defendant admits to illegally accessing computers.

   Q. What is it you're denying?

   A. What I am denying is that I received anything, any financial gain from doing these favors. RT 732:17-19.

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                    9

b.     **Post-Arrest Statement**

Rojas: And he didn't ask me for anything like to run his name or do anything like that. Um, you know, the only times he's done it was when; there hasn't been too many times where I'm outstanding on a loan, so the times that I am he's taken advantage of that.

Gilbert: And does he make the connection between, "You run the plate and you owe me money" or make some kind of?

Rojas: Kind of. He just gives me an extension. He won't ask.

Exhibit 46.11

3.     **Whether Bettencourt Requested Queries during the Period of Indebtedness.**

a.     **Direct Examination**

Q. The first time you supplied [Bettencourt] information, do you know if you even owed him money at that point?

A. No, I don't.

Q. And there was a period that you didn't owe him money?

A. Yes.

Q. How many months in that approximately 12 month period of time that you did not owe him money?

A. Maybe five months.

Q. So there's some question in your mind whether, the first time you supplied information to Bettencourt, whether there was a loan even at issue?

A. Yes.

RT 745:2-18.

b.     **Post-Arrest Statement**

Rojas: The first time he asked me to run it was…you know. He never asked me to do stuff like that or run his name unless I owed him money and um, so yeah, last year, I'm still trying to pay off this debt to him.

Gilbert: Uh-huh…

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                              10

1  Rojas: And me, you know, my conscience, I'm like, I know why he's doing it, you know?
2  He wouldn't ask me if I didn't owe him.
3      **4.**     **On Whether Conditions Were Ever Tied to the Loan or the Queries.**
4          **a.**     **Direct Examination**
5      Q. During the [post-arrest] interview, you were later asked, were there any conditions
6  [Bettencourt] put on the money, and type of conditions he put on giving you the money. Do you
7  recall your answer to that question?
8      A. Yes.
9      Q. How did you answer that question?
10     A. I said no, there were no conditions.
11     Q. But the further, I expect favors, there's a question, and you answered no, just when
12 you're going to pay me back and that was it. What did you mean by that? Do you recall?
13     A. Meaning that –
14     Q. Do you recall you saying that?
15     A. Yes, I recall.
16     Q. What's – put that in context for us.
17     A. Meaning that Mr. Bettencourt never expected me to do any favors for him because he
18 had loaned me the money.
19     RT 754:7 – 755:2
20         **b.**     **Post-Arrest Interview**
21     Gilbert: And does he say, "Because you owe me money, run my name and I'll give you,"
22 does anything like that happen or is it kind of unsaid?
23     Rojas: It's implied, you know?
24     Gilbert: You understand that you owe him money and that he's asking for this and this to
25 buy you more time on the loan?
26     Rojas: Yeah.
27     Exhibit 46.11
28

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                 11

Cooke: You do understand thought, that the records that…the DMV records, the criminal history - that's privileged information?

Rojas: Yes.

Cooke: Do you understand that?

Rojas: Yes. Yes, I do. I know it was wrong.

Cooke: And it's not okay to release that to a non-cop who doesn't have an interest. Do you understand that?

Rojas: Yes.

Cooke: But again, <u>it was just the pressure you felt to get the extension. That's what's going on here</u>?

R: <u>Yeah</u>.

Exhibit 46.23

**5.     On the Time-Line Between Repayment and the Queries.**

    **a.     Direct Examination**

Q.  I want to be really clear, because during the interview you make comments – I just want to read you an answer.  The investigator said, tell me about that, and I want to quote you – and that's 46.02 – "He'll say, can you pay me next payday?  And if we go past that, he'll send a reminder notice, or he'll ask a favor, like run my name."  Were those connected?

A.  No.

RT 757:22 – 758:6

    **b.     Post-Arrest Statement**

Gilbert: Is there a time-line that he's put you on when you borrow money?

Rojas: Sometimes. Like he'll say…

Gilbert: Tell me about that.

Rojas: <u>He'll say, "Can you pay me next payday?" And if we go past that, then he'll just send a reminder notice or he'll ask for a favor like "run my name."</u>

Exhibit 46.11

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                                    12

1    **6.    Whether the Queries Were Bettencourt's Way of Charging Interest.**

2    **a.    Direct Examination**

3    Q. But you and [Bettencourt] never came to an understanding of that?

4    A. We never discussed – we never discussed the repayment of the loan or how I was

5    going to repay him and providing him with information. Those two things were never

6    synonymous in our discussions or text messages.

7    RT 758:23 – 759:4

8    **b.    Post-Arrest Interview**

9    Cooke: So we have it happening in August. We have it happening in September. And

10   that's all I just brought with me to talk to you now… You're telling us it happened in '09, so this

11   has been going on pretty regularly probably since '09. When you're on the hook, and you're under

12   pressure. You're late on your payments. <u>This is his way of charging interest, Clay. That's what's

13   happening here, right</u>?

14   Rojas: <u>Yeah, you could say that</u>.

15   Exhibit 46.14

16   **7.    Whether the *Quid Pro Quo* Was the Interviewing Officers' Idea.**

17   **a.    Direct Examination**

18   A. But to me, all those things they were saying about me, these two guys who were not

19   only my superiors, but I also considered my friends, I felt like that was – they started talking

20   about the money and I just kind of let them run with that because I didn't want them to think that

21   I was selling guys out and putting my brothers in danger.

22   RT 762:5-11

23   **b.    Post-Arrest Statement**

24   Rojas: Yeah, I understand the concern. I understand all that but like I said, it's - the

25   department is fine. Nobody has anything to worry about. <u>This is about me owing a debt and

26   feeling the pressure to pay it back and those are the ways I paid it back or got my extensions</u>. It's

27   never compromised any officer in this department.

28

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                13

Exhibit 46.22

**8.      Defendant Claims Gilbert and Cooke Devised the *Quid Pro Quo*.**

   a.      **Cross-Examination**

Q. And what is your response?

A. My response is, yeah, you could say that. But like I said before, I knew their line of questioning was going to – towards this big conspiracy theory with the Hells Angels, so I let them run with the idea.

Q. This section says nothing about the Hells Angels. This section says, you owe money to Bettencourt, you're late on your payments, his way of charging interest is asking you to do these database queries, and your answer was, yeah, you could say that.

A. Right. And I understand that's what it says in this section. But the whole entire interview wasn't played, so like I said before, when they brought me in, and as the people have heard from the video, they were – they were pretty much saying, or inferring that I was in bed with the Hells Angels and I was working for the Hells Angels. They asked me questions if I owed money to the Hells Angels or if the Hells Angels were paying me for anything when, frankly, the Hells Angels had nothing to do with any of this.

Q. But Bettencourt gave you more time to pay back the loan in exchange for that information, didn't he?

A. No, he didn't. He always wanted to be paid back.

Q. He gave you more time to pay him back?

A. More time passed, but he didn't give me more time.

RT 767:2 – 768:8

**9.      Defendant Denies Implicit Agreement with Bettencourt.**

   a.      **Cross-Examination**

Q. And Sergeant Gilbert says, So he gave you some time, he just started to back off? And your response is?

1   A. My response is yes.  But he never expressed that to me.  He never said, If you do this,
2   I will give you more time.
3   Q. No.  It was implied, right?
4   A. No, it wasn't.
5   RT 769:7-15

6   **10.    Defendant Claims He Only Agreed to the *Quid Pro Quo* Out of Fear for Being Labeled a Hells Angels Informant.**
7

8   **a.    Cross-Examination**

9   Q. Question, You understand that you owe him money and that he's asking you for this
10  to buy you more time on the loan?  And your answer is what, sir?
11  A. My answer is yeah.  But like I said, based on the line of questioning and where they
12  were going, I let them run with the whole idea because my biggest fear was that they were going
13  to label me a Hells Angel informant or – I basically wanted to calm them down and get them to
14  jump off that, or get off that ledge that they were ready to jump off, which they did anyway.  But
15  like the evidence shows, there is – none of the statements that I made here about getting
16  extensions or anything like that is shown here.
17  Q. You told –
18  A. There's nothing to back up my statements.  I was just saying it because I was scared
19  that I was being labeled as an H.A. informant.
20  RT 769:25 – 770:20.

21  **11.    On Whether Defendant Had the Choice Between Repaying Loan with Money or Information.**
22

23  **a.    Cross-Examination**

24  Q. Okay.  Now, there's a question trying to clarify, and here's the question, is it because
25  he was asking for the type of information that you'd already given, or he's asking for more
26  sensitive information.  And what is your response?
27
28

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                    15

1       A.  No, just for that, no, I can't do that, and sometimes – that doesn't make sense – but
2   sometimes I would say no because I knew I was going to pay him like that week or something
3   like that, you know.  But I was fighting him off.
4       Q.  Okay.  You're saying here that you had a choice, right?  There were times that you
5   could tell him no, right?
6       A.  Yes.
7       Q.  There were times that you told him no and that's because you were able to pay off that
8   loan, right?
9       A.  That's what I said, yes.
10      Q.  Isn't that true?
11      A.  No, it's not.
12      Q.  You didn't mean what you just said here?
13      A.  There's a lot of stuff in this statement that I didn't mean.
14  RT 791:18 – 792:16

      **b.**    **Post-Arrest Statement**

16  Rojas: That's where I drew the line.  I never did anything more than that.
17  Gilbert: At criminal histories for people you don't know? That's where you drew the line?
18  Rojas: Yeah. I never did anything more than that?
19  Gilbert: That's important because we want…why I was asking and I think is the more
20  blunt question; you drew the line at, "I won't go past giving a criminal history for unknown
21  people." Like if he ran me, "Hey, I want to know what his criminal history is," what would you
22  have done with that?
23  Rojas: I would have been like, "No, I can't do that."
24  Gilbert: Did he ever ask you for something that and you told him, "I can't do that"?
25  Rojas: Yeah, a couple of times he was like, you know, I mean even with the plates. That's
26  why I know it was very few times and those few times only because the pressure was increasing;
27  other times I was just, "No, I can't do it, man."

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                                16

Gilbert: Now, is that because he was asking for a type of information that you've already given or he's asking for more sensitive information?

Rojas: No, just for that, "No, I can't do that." And <u>sometimes I would say no because I knew I was going to pay him like that week or something like that, you know, but, you know, I was fighting him off.</u>

Exhibit 46.32

Defendant's statements cited above were offered at trial solely for the purpose of misleading the trier of fact on the existence of the *quid pro quo* – an essential element for the honest services fraud counts, as well as the felony unauthorized access counts.  Absent the existence of any private financial gain to the defendant, or a *quid pro quo*, the government would not have been able to obtain a conviction on these counts.  The statements, therefore, were material to the trial proceedings.  Furthermore, there should be no doubt concerning the intentional and willful nature of the trial testimony.  He devised a strategy to admit to misdemeanor level conduct, and voluntarily took the witness stand to attempt to explain away his prior inculpatory statements.  By doing so, he submitted false testimony to the trier of fact.  The obstruction of justice enhancement should be applied.

## II.     THE GOVERNMENT'S SENTENCING RECOMMENDATION

Society is undeniably harmed by corrupt public officials.  The harm is usually intangible, but real enough: the undermining of public confidence, the loss of respect for and pride in our institutions.  This is especially true when the public official is a police officer.  Here, Bettencourt, a known felon and member of the Hells Angels, bought and paid for a Santa Clara police officer for the paltry sum of several thousand dollars.  Defendant harmed society by placing his personal interests, and the interests of Bettencourt, ahead of the public he served.  Even if the defendant otherwise performed his duties properly, by accepting bribes he injured society by suggesting his services were for sale.  He owed a duty of honesty and loyalty to the citizens of Santa Clara, and he breached that duty.

UNITED STATES'
SENTENCING MEMORANDUM
CR 10-00931 LHK                                  17

Defendant also owed a duty to his fellow officers. He repeatedly stated during trial that he did not want to be considered a traitor, or labeled as a Hells Angels informant. Little did he realize the injury he caused to the police department by accepting bribes from Bettencourt. It should be pointed out that, at the beginning of this case, the leadership of the Santa Clara Police Department recognized it had a potentially serious problem, and referred the matter to the Federal Bureau of Investigation. Compare this response by the department leadership to the statements made by the defendant in the Presentence Investigative Report, where he claims that other members of law enforcement access databases for personal reasons, and he believes he is being singled out. PSR ¶ 55. Even after a public trial, defendant still does not appear to appreciate that the harm to the community and the police department resulted from the bribe itself, and his willingness to accept bribes in exchange for official actions.

The government recommends a sentence of 41 months imprisonment total, a fine of $7,500, and three years of supervised release. The government's recommended prison sentence considers both the offense conduct, as well as the factors set forth in 18 U.S.C. § 3553(a). Defendant breached the duties of loyalty and care that he owed to the community, as well as to the police department, by accepting bribes. He did so on multiple occasions over a two-year period. And when given the opportunity to explain himself during trial, he offered false testimony to mislead the jury in an effort to limit the damage. He has not demonstrated sufficient respect for the law, and deserves sufficient punishment. Further, imprisonment should deter the defendant, as well as other potential public officials, from ever willfully violating the law or the duties of honest services owed. Accordingly, defendant should receive a significant prison sentence, and the government recommends 41 months in custody.

Dated:  February 22, 2012                                      Respectfully submitted,

                                                    MELINDA HAAG
                                                    United States Attorney

                                                                     /s/
                                                  DANIEL R. KALEBA
                                                  JEFFREY B. SCHENK
                                                  Assistant United States Attorneys